ROBERT L. HORRELL v. THE STATE.

No. 16013. Delivered May 31, 1933.
Reported in 61 S. W. (2d) 108.

The opinion states the case.

*Fryer & Cunningham,* of El Paso, for appellant.

*Roy Jackson,* District Attorney, and *Frank B. Clayton,* Asst. Dist. Attorney, both of El Paso, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for life.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Edward McMillan by shooting him with a pistol.

Deceased had been a barber at Five Points in the city of El Paso for 15 years. His custom was to return home about 10 o'clock on Saturday night. On Saturday night, November 19, 1932, about 9:30 o'clock, the attention of the wife of deceased was attracted by hearing two shots close to her porch, followed by the sound of two people running, one in one direction and the other another way. She next heard some groaning close to her door, but was afraid to investigate. A little later she telephoned the police, who, upon investigation, found her husband dead. Deceased's body was found at the rear door of his residence. There were two bullet wounds in the body. One of the bullets was removed and turned over to the police for identification. The other bullet was found on the sidewalk near where deceased's body was found, and was also turned over to the police for identification.

W. C. Woolverton, captain of detectives on the police force of the city of El Paso, began an investigation of the murder the morning after it happened. About 10 o'clock of that morning he saw appellant and his codefendant, Shiplain, two or three blocks away from the scene of the crime. He later arrested the parties and took from the possession of appellant a pistol which was wrapped in a newspaper. Upon examination of the gun it was found to be a 41-calibre pistol. It contained two exploded shells and three unexploded shells in the cylinder.

Appellant was searched at the police station, a small towel being found in his pocket.

A ballistic expert testified that he made an examination of the bullets recovered from the body of deceased and the sidewalk where he fell, and also of the pistol found in the possession of appellant, and that after experimenting, he was of the opinion that the bullets were 41-calibre and were fired from the gun which was taken by Captain Woolverton from the possession of appellant.

A taxi driver, whose stand was located about four blocks from deceased's residence, testified that at about 9:35 p. m. the night deceased was killed, appellant and another man came to his stand and he took them to the corner of Overland and El Paso streets in the city of El Paso.

A pawnshop operator gave testimony to the effect that the pistol which had been taken from appellant had been pawned to him by appellant's codefendant, Shiplain, on October 9, 1932, and that it was redeemed by appellant about 3 o'clock p. m., November 19th, the day of the homicide. He said appellant and Shiplain came together to get the pistol, and that they both indicated that it belonged to appellant. Further, he testified that appellant purchased a roll of tape and that the handle of the pistol was cracked. He identified the tape which was around the handle of the pistol taken from appellant as being the same kind of tape sold to appellant on November 19th.

Appellant's codefendant, Shiplain, testified that he became acquainted with appellant in El Paso; that some time prior to the homicide, appellant told him that it was deceased's custom to go home on Saturday nights with thirty or forty dollars in his pocket; that appellant proposed that they rob deceased; that they made two unsuccessful attempts to rob deceased; that on the day of the homicide, they went to the pawnshop heretofore mentioned and redeemed the pistol, and appellant bought a roll of tape with which to tape the handle; that about 8:15 p. m. they took a street car and rode to the vicinity of deceased's home and waited until deceased approached; that they both wore towels as masks; that as deceased approached, appellant stepped out, pointed the pistol at him, and ordered him to put up his hands; that appellant's mask slipped so as to reveal his face; that deceased said: "Are you crazy? I ain't got nothing." That deceased started walking away; that appellant commanded deceased to stop and put up his hands and deceased continued to walk off; that appellant fired two shots at deceased; that he and appellant then ran in different directions and rejoined each other some distance away; that they

hid the pistol in an alley and returned to town; that the next morning they returned and got the pistol, and, while returning to town, were arrested by Captain Woolverton.

Appellant did not testify in his own behalf.

Appellant objected to all of the testimony of the arresting officer touching the finding of the pistol, and also objected to the testimony of the ballistic expert relative to the test made to determine whether the bullets found in deceased's body were fired by the pistol taken from appellant. The objection was that the arrest was illegal. The officer had no warrant of arrest. The municipal authorities had enacted an ordinance under the provisions of article 214, C. C. P., which reads as follows: "The municipal authorities of towns and cities may establish rules authorizing the arrest, without warrant, of persons found in suspicious places, and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the law."

The state relied on the ordinance enacted under the foregoing article and introduced before the court the testimony of the arresting officer, which was, in substance, as follows: At 11:45 on the night of the homicide, he was notified that deceased had been murdered. On the morning following the murder he made a search of the neighborhood in which the homicide occurred in an effort to secure evidence that might lead to the arrest of the offender. He lived two or three blocks from the scene of the homicide and had been living there for about 15 years. He was acquainted with the inhabitants of the neighborhood. He had never seen appellant or his codefendant Shiplain in that part of town prior to the morning of November 20th, but had seen appellant at deceased's barber shop at Five Points on previous occasions. He did not know Shiplain, appellant's codefendant. He knew that appellant had a previous criminal record. Appellant had served a term in the penitentiary in California for murder and robbery, receiving penalties of 99 years on each occasion. While making his investigation he saw appellant and Shiplain about three blocks from the scene of the homicide at about 11 a. m., which was something like 12 hours after the offense had been committed. At the time he saw the parties he had in mind the fact that appellant had theretofore been convicted of murder and robbery. He observed that appellant and Shiplain separated, but that as a street car came along, they got back together and got on the street car going toward town. Desiring to talk to the parties, he followed the car. He observed that appellant and his com-

panion were watching him through the window, and that Shiplain was looking out. Passing the car, he went to a telephone and called for help. After putting in this call he overtook the street car. Appellant and his companion were not on the car. Believing they were trying to get away from him, he instituted a search, and found them on the next street (which was parallel to the street the street car was traveling), walking in the direction of town. Appellant had something in his hand, wrapped in a newspaper. Meeting appellant and his companion, he apprised them that he desired to talk to them. Walking up to them, he placed handcuffs on Shiplain and reached over to handcuff appellant. Appellant shifted the bundle from his left to his right hand, saying that he had not done anything to be handcuffed for. As the bundle was shifted, he (the officer) took hold of it and discovered that it was a pistol. Handcuffing the parties, he took them to the police station, where they were searched.

Appellant contends that the testimony of the officer shows that the arrest was made on mere suspicion. It is the state's position that the facts and circumstances related by the officer are sufficient to show that the arrest was made under circumstances which reasonably showed that appellant was guilty of the homicide. We deem the arrest to have been warranted. The officer knew that the homicide had been committed. The actions of appellant and his companion, considered in connection with the criminal record of appellant and the other circumstances related by the officer, would have, in our opinion, created in the mind of any reasonable man, acting in good faith, a belief in appellant's guilt. It is not to be understood that an arrest may be made on mere suspicion. In the present case, however, there seems to have been more than a mere suspicion. There was probable cause to warrant the belief by the officer that appellant was the offender. The state should not be bound by a portion of what the officer said, but his entire statement should be considered. The fact that the officer said, on cross-examination, that he arrested the parties on suspicion would not seem to militate against the conclusion that the facts and circumstances related by the officer justified the arrest, under article 214, C. C. P., and the ordinance to which reference has been made. See Bennett v. State, 55 S. W. (2d) 847. See, also, 5 Corpus Juris, sec. 46, p. 416. The arrest being legal, the testimony to which objection was interposed was properly received in evidence.

A careful examination of all of appellant's contentions leads us to the conclusion that error is not presented.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.